FILED

2010 Apr-09  AM 10:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ROGERS GROUP, INC., | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 5:09-CV-00990-IPJ |
| THE LIMESTONE COUNTY | : | |
| COMMISSION OF LIMESTONE | : | |
| COUNTY, ALABAMA, | : | |

_____

| | | |
|---|---|---|
| LIMESTONE COUNTY, ALABAMA, by | : | |
| and through the LIMESTONE COUNTY | : | |
| COMMISSION, its official governing body, | : | CIVIL ACTION NO. |
| JUDY SANDERSON PAGE, JAMES M. | : | 5:09-CV-01006-SLB |
| NEWBY, JR., TRACI MCLIN, HOPE | : | |
| CARR, and ANDRE CARR, | : | (Removed from Circuit of |
| | : | Limestone County |
| v. | : | CAF CV-2009-900090.00) |
| | : | |
| ROGERS GROUP, INC. | : | |

_____

**TRIAL BRIEF ON BEHALF OF ROGERS GROUP, INC.**
_____

## Introduction[1]

Rogers Group, Inc. is a Nashville based, family owned corporation that operates over 60 crushed stone quarries in five states, including five crushed stone quarries in Alabama. The complaint in this matter alleges, and Limestone County

_____

[1] This brief is not intended to address every argument of Rogers Group, but rather, to acquaint the Court generally with the case.

admits, that crushed stone is an essential ingredient for the construction industry. (Answer of Defendant Limestone County Commission, ¶ 10.)  In truth, virtually nothing can be built without it.  Concrete is largely made from crushed stone mixed with sand and cement, and asphalt is stone, sand, and a petroleum based binding agent.  (*Id.*)  Crushed stone is used as the base under roads and parking lots *id.*, and concrete is used in the driveways and foundations for most houses.  When concrete blocks are used, those blocks also contain crushed stone.

Crushed stone is a relatively inexpensive product, ranging from as little as $6 or $7 a ton up to more than $10 per ton.  At the same time, however, stone is expensive to transport because of its weight, and thus most communities must have a local source of crushed stone.  Likewise, to remain competitive a crushed stone producer must look for new sites to supply new markets.

**Rogers Group Begins Looking For A New Site In Limestone County**

In the 1990s, Rogers opened a quarry in the Elkmont Community of Limestone County.  That particular location was a compromise because of Limestone County's opposition to Rogers Group's then preferred location between Athens and Huntsville.

Over time, the Elkmont location proved less than satisfactory, however, because of the local road network to access it, and its relatively greater distance to

the Huntsville, Madison, and Decatur markets.  As a result, Rogers Group began looking for an alternate site closer to those markets.

To be commercially viable, a crushed stone site must have a stone deposit that will meet Alabama Department of Transportation specifications, *id.* at ¶12, the deposit must be relatively near the surface, as the stripping of dirt (overburden) to get to the stone can make it cost prohibitive to mine a site, the site should be on a good transportation network, and the site must be in an area where mining is a lawful use.  Finally, it must be possible to assemble enough property to operate a mine.

Needless to say, finding a site that meets all of these criteria can be difficult.

## Rogers Locates The Tanner Site And Gets It Under Contract

In 2007, however, Rogers Group located a 261 acre site near Tanner, on a four lane highway, with a stone deposit that met the Department of Transportation's specifications, and was relatively close to the surface.  On top of that, the site was owned by one person, who was willing to lease or sell it.  As a result, on August 16, 2007, Rogers Group entered into an Option and Lease Agreement with Francis Bateman to lease the property that is at issue herein. (Exhibit A.)  The Option and Lease Agreement explicitly granted Rogers the right to mine the property.

**Limestone County Commends Rogers Group's Selection Of The Tanner Site**

On September 26, 2007, representatives of Rogers Group attended a Limestone County work session to tell the Board of Commissioners they had found the Tanner location, intended to open a crushed stone quarry there, and would close the Elkmont location at some future time.  Chairman Siebert, who was named as Limestone County's F.R.C.P. 30(b)(6) witness in this matter, stated at the meeting that "Rogers Group has been an excellent corporate citizen" and "I think the new location is a much better fit for a rock quarry."  (Seibert Dep., Exhibit B, p. 72.)[2]  One of the reasons the Tanner site was better was its location on Highway 31.  (*Id.*)  No member of the Board expressed any disagreement with Chairman Seibert's remarks, and Rogers Group had no reason to believe Limestone County would be opposed to the site.  (*Id.* at 62.)

At the time Rogers Group appeared before the Board of Commissioners, in 2007, mining was a lawful use on the Tanner property.  (*Id.* at 13-17, 32-33.) Limestone County had previously decided not to adopt a zoning ordinance, and no building permits were required by Limestone County for the operation of a quarry

---

[2] Excerpts of depositions are attached as exhibits.  Complete deposition transcripts are being filed separately.

on the property.  (*Id.* at 13-16.)   The only license or permit Limestone County required was a business license.  (*Id*. at 16.)

Unbeknownst to Rogers Group, however, a locally influential family, the Newby's, controlled a large amount of raw land in Limestone County; additionally, Jerry Newby is president of Alfa Insurance and the Newby family was opposed to Rogers Group's proposed quarry, despite Limestone County's support for it. Shortly after Rogers Group's announcement of its Tanner site, Senator Butler met with Chairman Seibert, who candidly testified that he "wasn't near as passionate about" the new site as he had been after he found out some people were opposed to it.  (*Id.* at 75.)   His passion for the new site continued to decrease as more people opposed it.  (*Id.* at 75, 77.)

## State and Federal Regulation of Crushed Stone Mining

Crushed stone mining is highly regulated.  *Hall v. North Montgomery Materials, LLC*, 2008 Ala. Civ. App. Lexis 370, *12, 2008 Westlaw 2060946 (Ala. Ct. Civ. App. 2008).  The United States Environmental Protection Agency, through state governmental agencies like ADEM, requires that crushed stone quarries first obtain an Air Quality permit before beginning operations.  EPA sets the criteria for the issuance of such permits under the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, including the amount of particulate emissions (dust) that can be leave the quarry

property.  Unless a quarry can demonstrate compliance with that federally mandated standard, it cannot be issued an Air Quality permit.  These limits on particulate emissions apply to all of the operations on a quarry site.  The enforcement of the Clean Air Act and the issuance of permits under it is delegated to ADEM in Alabama.

The second major permit required for a quarry is a water quality permit issued under the Clean Water Act, 33 U.S.C. § 1251 *et seq*., typically in the form of a National Pollutant Discharge Elimination System, ("NPDES"), permit.  This permit regulates any point source discharges from the quarry into waters of the state, setting standards for the cleanliness of any such discharge.  In Alabama, the NPDES permit process is also delegated to ADEM and is used to enforce criteria for grading and storm water management on a quarry site.

The final state regulatory subject is blasting, which is regulated by the Alabama Explosives Safety Act of 1993, Code of Alabama, § 8-17-240, under which the State Fire Marshall sets limits for vibrations produced by blasting, expressed as peak particle velocity.  Further, according to the County's expert, Alabama informally imposes a maximum peak particle velocity at 2.0 inches per second.  (Haynes Dep., Exhibit C, p. 186.)  The blasting done by Rogers Group to date at this site has produced a maximum peak particle velocity of .095, or less

than 5% of the  2.0 limit cited by the Plaintiffs, at four different seismographs deployed by an independent vendor to measure each blast.  That vibration level is also far less than what is produced by multiple daily, human activities, like walking across the floor, closing a door, and various other everyday activities.

**Rogers Group Applies for Its Environmental Permits**

Rogers Group applied to ADEM for the environmental permits necessary to operate the quarry on or about October 4, 2007.  On October 31, 2007, Senator Butler wrote ADEM urging it not to approve Rogers's applications, Exhibit D, and a month later on November 30, 2007, again wrote ADEM, advising it he intended to introduce legislation prohibiting rock quarries in Limestone County, and seeking a meeting between the Limestone County delegation and ADEM.  (Exhibit E.)

**Limestone County Pushes For Special Legislation to Stop the Rogers Quarry**

True to Senator Butler's letter to ADEM, in 2008, local Limestone County State Legislators introduced legislation that would have given the Limestone County Commission veto power over quarries in it, something it could also have done by adopting zoning.  (Siebert Dep., at 83-84.)  The legislation failed and Limestone County (and Rogers Group) concluded in 2008 that bills to stop the quarry in Limestone County were dead.  (*Id.* at 85-87.)  Limestone County in fact concluded that the quarry was going to open.  (*Id.* at 87.)

Limestone County, and others, however, continued to bring whatever pressure they could to bear on ADEM, state legislators, and others. As a result, the ADEM process moved quite slowly. In October of 2008, however, ADEM announced it was taking public comments on the possible issuance of permits to Rogers. (*Id.* at 87.) At that time Senator Butler told Chairman Seibert that if ADEM issued the permits it was "pretty much a foregone conclusion that [Rogers] can go forward with the quarry." (*Id.* at 89.) The only way to stop it would have been retroactive legislation, which Limestone County admits the acts at issue are not. (*Id.* at 89-90.) Chairman Seibert testified on behalf of Limestone County that he thought that if the legislation was passed after the permits were issued and Rogers "had prepared the site for a quarry" the legislation would not be effective. (*Id.* at 91.)[3]

## ADEM Issues Permits To Rogers

Finally, almost 18 months after Rogers Group applied for its environmental permits, on February 10, 2009, ADEM issued Rogers Group the necessary permits to operate its South Limestone quarry. Limestone County, and the Individual Plaintiffs herein, could have appealed the issuance of those permits, but did not.

---

[3] Chairman Seibert was asked if there was any level of activity by Rogers prior to the effective date of the four acts that would suffice to show Rogers had a quarry there and said he "want[ed] the court . . . to decide that." (*Id.* at 95.)

Once the ADEM permits were issued on February 10, 2009, and Rogers Group obtained its business license from Limestone County on Feb. 27, 2009, it had all the permission it needed to operate a quarry on its Tanner site.  (Siebert Dep., p. 102.)  Limestone County concluded that there wasn't much that could be done about Rogers opening a quarry on the South Limestone property.  (*Id*. at pp. 89-90.)  In fact, when the ADEM permits were issued, there still was no zoning applicable to the Rogers Group's South Limestone quarry property, and no legislation had been enacted or was pending in the Alabama Legislature that would have prohibited Rogers Group's quarry.  (*Id*. at 17-19, 103.)

## Rogers Group Proceeds To Open Its Quarry

As a result, on February 27, 2009, Rogers Group applied for and obtained a business license from Limestone County to operate a quarry on the South Limestone property.  (Exhibit F, hereto.)  Three days later, on March 2, 2009, Rogers Group began grading on the property and selling overburden (the soil over the minerals) from the site.  (Exhibit G.)  No later than March 23, 2009, the South Limestone Quarry had been registered with the Mine Safety and Health Administration and assigned MSHA Mine ID: 01-03413.  (Exhibit P.)

Over the following weeks, in March and April of 2009, Rogers Group stripped the soil to expose the minerals on site, constructed roads on site, and

finished installing the infrastructure required under its NPDES permit. Photos of some of this work are collected in Exhibit H. Complying with its NPDES permit, and in particular with the storm water management requirements on the site, dictated that certain activities proceed in a logical sequence, including construction of a large sediment pond so that storm water could be managed and not run off into nearby Swan Creek. Photos collected at Exhibit H show various phases of the construction of that pond and other site work in March and April of 2009.

Once Rogers had the necessary infrastructure in place and had removed the overburden on the stone, it began drilling, extracting and processing stone from the site. As a result, Horton Drilling drilled the mineral deposit on site on or before May 5, 2009 so that the drill holes could be loaded with an explosive mixture to blast stone from the ground. Rogers then conducted a blast on May 6, 2009 that severed some of the minerals on site from the earth. Exhibit I shows the records of that blast and Exhibit J is a photo taken a week after the law at issue became effective showing the pit made by blasting on site.

Rogers Group then used its front-end loaders and off-road haul trucks to take that extracted stone to a crusher on site, where it was crushed and went into a stockpile on site. Soil and stone from the site were then sold to four different customers on May 4, 5, 6, and 11, 2009. (Collective Exhibit K.)

At the time all of this was done—drilling, blasting, extraction, processing, stockpiling, and sale of crushed stone products—Rogers Group had all of its environmental permits, it had a business license from Limestone County, there was no zoning in Limestone County, and mining was a lawful activity on site.[4]

**Limestone County's "Dead" Legislation Comes Back To Life**

At the time Rogers Group was issued its ADEM permits, and its business license, even Limestone County believed that Rogers was entitled to open and operate its quarry.  (Siebert Dep., pp. 89-90.)  To everyone's surprise, however, and in a process that isn't fully understood, in May of 2009 two local legislators were able to "sign" two bills out of the local legislation committee before a public hearing could be requested on them.  (*Id.* at 108.)  As a result, the bills could be pushed through in a matter of a few days.  Up to the time Governor Riley signed the legislation on May 11, 2009, however, even Limestone County was uncertain whether the legislation would be signed or not.  (*Id.* at 111.)  Limestone County agrees that the legislation is not retroactive and does not apply to a quarry that existed on May 11, 2009.  (Siebert Dep., p. 90.)

---

[4] Exhibit L is a photo of the processing plant that was in place and crushed stone on site prior to May 11, 2009.  The photo itself was not taken until May 19, 2009.

## Alabama's Definition of Mining

Under the definition of mining in Alabama state law, Rogers Group engaged in mining on the site at least as early as March of 2009.  Although it is common to use the colloquial term, rock quarry, most states, including Alabama, use the term "surface mining" to define open pit mining such as that done by Rogers on the South Limestone quarry property.   The Federal Mine Safety and Health Administration also regulates quarries, but likewise calls them mines.  According to Limestone County's own expert, a crushed stone surface mine and an open pit crushed stone quarry are the same thing.  (Haynes Dep., p. 193.)

The Alabama Administrative Code, Chapter 335-6-9 defines "surface mining" as

> "all or any part of the process of recovering any material or mineral by removal of such mineral from the surface or by removal and displacement of the strata or  material which overlies its mineral deposits in its natural conditions, and shall include but not be limited to the open pit . . . method  . . . ."

That same section defines a "pit" as "any tract of land from which overburden has been or is being removed for the purpose of surface mining."

In this case, it cannot be disputed that Rogers was issued its ADEM permits on February 10, 2009, that it was issued a business license by Limestone County on February 27, 2009 for the operation of a crushed stone quarry on this site, and

that in March of 2009 it commenced the "process of recovering" minerals by "removal of such minerals from the surface or by removal or displacement of the strata or material which overlies" the mineral deposits in their natural condition. Moreover, by May 6, 2009, Rogers Group had actually blasted stone from the earth, extracted the stone, crushed the stone, and on May 4, 5, 6, and 11 sold soil or stone to four different customers.  (Exhibit K.)

It had thus not simply engaged in "any part of the process" of mining, but had literally done every part of the process necessary to blast, extract, crush, and sell stone from its South Limestone quarry site.   Even Limestone County's complaint, dated May 20, 2009, only nine days after it claims the Local Acts became effective, alleges that by then Rogers had already "engaged in blasting, rock crushing and other mining activities" to such an extent that it had already caused "road deterioration" and interfered with the peace and quiet of the area. (Limestone County's Verified Complaint for Preliminary and Permanent Injunctive Relief, ¶¶ 5, 6.)[5]

If the statutory definition of mining ADEM applies is ignored, Alabama common law, as explained by the Alabama Supreme Court, would likewise hold

---

[5] In fact, based on the Stipulations Limestone County and Rogers have exchanged, it appears there will be a stipulation that Rogers blasted, extracted, crushed, and sold stone from the site prior to May 11, 2009.

that Rogers had an "existing" use of its property as a quarry by the effective date of the Acts:

"The expression 'existing use,' though difficult to define, is, as a fact, not difficult of determination.  As understood in the ordinance, 'existing use' should mean the utilization of the premises so that they may be known in the neighborhood as being employed for a given purpose; * * * .  Where a property is built for or adapted to a particular use, the question of existing use is determined by ascertaining as near as possible the intention of the owner. . . ."

*Green v. Copeland*, 239 So. 2d 770, 771 (Ala. 1970).

By May 11, 2009, Rogers Group's property had been "adapted to a particular use." (*Id.*) Rogers had been issued its environmental permits over three months earlier, its business license over two months earlier, and it had dramatically altered the site by commencing grading and extraction of stone on it. Even Limestone County's expert concedes that this was "mining" and it is undisputed it occurred before the Act became effective. (Haynes Dep., pp. 101-04.) Likewise, there was a sign on its property telling everyone in the "neighborhood" that the property was being "employed" as a quarry no later than April of 2009. (Exhibit M.)

Limestone County has identified Charles D. Haynes as an expert to testify that none of this activity by Rogers, not even extraction, crushing and selling minerals, is sufficient to constitute a quarry. According to Mr. Haynes, this activity is "mining" (Haynes Dep., pp. 101-10), but the site is not a quarry. Indeed,

according to Mr. Haynes, even if material is extracted from the site, hauled to a crusher and processed into crushed stone, he would not consider the site a quarry. Mr. Haynes admitted, however, that there is no term in the state regulations called "quarry;" instead, regulations issued by the State of Alabama define "surface mining," and Haynes admitted that Rogers had engaged in surface mining of the Tanner site. (*Id*. at 107-11.) Further, according to Haynes, Limestone County's own expert, a crushed stone "surface mine" and an "open pit crushed stone quarry" are the same thing. (*Id*. at 193.) Haynes agreed that the activity conducted by Rogers Group on site prior to the effective date of the legislation was in fact surface mining. (*Id*. at 108-09.)

### **The Individual Plaintiffs' Nuisance Claim is Premature and Speculative**

Quarries are not nuisances per se. *Hall v. North Montgomery Materials,* 2008 Ala. Civ. App. Lexis 370, 2008 Westlaw 2060946 (Ala. Ct. Civ. App. 2008). (Analyzing elements of operations rather than declaring nuisance per se.) Rather, like other businesses, they can become a nuisance based on the way they are operated, *i.e.,* a nuisance per accidens. *Smith v. Gill*, 310 So. 2d 214 (Ala. 1975) ("An otherwise lawful business will become a nuisance per accidens when operated in such a way as to cause persons of reasonable tastes to be unreasonably inconvenienced.") The Individual Plaintiffs, however, seem to be approaching this

case as if quarries are nuisances per se and they need only prove that the Rogers' quarry will devalue their property.  Their burden, however, is to show that this particular quarry has been operated in a nuisance like manner.  Further, because their claim here is for a private nuisance, they must show both that the operation of the quarry has been a nuisance and that it specifically impacts their property in a manner different from the general public.  Ala. Code §§ 6-5-120, 121; *Selma v. Jones*, 79 So. 476 (Ala. 1918).

To date, plaintiffs have made no effort to prove that the Rogers quarry's operations over the past year have constituted a nuisance.  The three page report filed by their expert merely states his "professional opinion . . . that the proposed quarry *will* have a disruptive effect on the property located in close proximity" to it.  (Exhibit N, emphasis added.)  It then lists various factors he evaluated in concluding that the proposed quarry will create certain "problems," but the list of factors itself is nothing short of conclusory and speculative.  For example, with respect to blasting, Mr. Haynes concedes that he is not a blasting expert, Haynes Dep., p. 39, and his report merely states that  the "regular occurrence [of blasting] is an irritant to anyone nearby the site" and if "not strictly conducted in accordance with good design," can "damage nearby structures and cause fly-rock injuries." (*Id.*)  That is the entirety of his report on blasting.  On noise pollution, Mr. Haynes

again concedes he is not an expert, *id.* at 174, and the entirety of his opinion is that

a "rock quarry is a relatively noisy location, generating noise from blasting,

crushing, and transportation activities."  (Exhibit N.)  Haynes's report also offers

conclusory opinions about truck traffic on Highway 31, but he again concedes he is

not an expert on traffic, Haynes Dep. at 153-54, and cites not a single piece of data

of any kind to support his opinion.

The plaintiffs' burden here is to show that the Rogers quarry is operated in a

manner that is a nuisance to them, not that it might someday become one.  As the

decision in *Hall v. North Montgomery Materials,* 2008 Ala. Civ. App. Lexis 370,

2008 Westlaw 2060946 (Ala. Ct. Civ. App. 2008) shows, it is not enough for

plaintiffs simply to complain that there will be dust, or noise, or blasting.  Instead,

especially in view of the "highly regulated nature of the mining industry, *North*

*Montgomery Materials, supra*, at *12, it is incumbent on the plaintiffs to prove that

specific impacts on them rise to the level of a nuisance now.

The decision in *North Montgomery Materials* illustrates the burden plaintiffs

have to show that a quarry's operations are a nuisance.  There, like here, the

plaintiffs based their nuisance claim in part on alleged air pollution.  The Court of

Appeals noted, however, that the quarry had taken steps to "comply with state and

federal air quality and water quality regulations in order to receive a permit from

ADEM." (*Id.*) As a result, "in view of the highly regulated nature of the mining industry, the Circuit Court was authorized to find that the local residents' fears concerning air and water pollution were 'doubtful, contingent or merely problematical. . . .'" (*Id.*)

Here, of course, it will be undisputed that Rogers obtained an Air Quality permit for its mining operations, and that each of the plaintiffs had an opportunity to appeal the issuance of that Air Quality permit, but did not.  There has been no attempt by plaintiffs to date to show that Rogers Group is not in compliance with its Air Quality permit, or, indeed, to show what the level of dust emissions from this site, if any, has been over the past year.  In fact, plaintiffs "nuisance" expert admitted that dust is present "everywhere" from various sources in rural areas, and admitted he didn't know what the existing level of dust is without the quarry, or how much it had been increased, if any, by quarry operations.  (Haynes Dep., pp. 73-79.)

The plaintiffs in the *North Montgomery Materials* case also sought to base their nuisance claim on blasting at the site, but failed to offer evidence on exactly how they would be impacted by the blasting, and thus failed to prove a nuisance from it. *North Montgomery Materials, supra,* at *10-11.

The same is true here.  Plaintiffs have not even retained a blasting expert, nor taken the deposition of Rogers Group's blasting expert.  Hence, it is unclear at this point whether Plaintiffs intend even to attempt to make a case on blasting.  If they do, the evidence will show that Rogers Group has only blasted 6 times at this site over the last year, that the vibration level for blasting has been extraordinarily low at locations much closer to the blasting than these plaintiffs' properties are, and that the noise levels have been well within accepted bounds.  There will be no basis to conclude the blasting to date has been anything other than well managed and not a nuisance.

Finally, plaintiffs will no doubt claim that mere diminution in property values is proof of a nuisance, but it is "settled . . . that the mere fact of diminution in value of complainants property . . . , without more, is unavailing as a ground" for nuisance.  *Nevins v. McGavock*, 106 So. 597, 598 (1925).

The only basis on which a nuisance was ultimately found in *Hall v. North Montgomery Materials* was the fact that truck traffic from the quarry would have used between three and one half and five miles of local, narrow, "farm to market roads" to access U.S. Highway 231.  None of the roads were designed for heavy vehicle use, some were as narrow as 17 feet at points, and the mining company itself admitted that the roads were not acceptable for the heavy truck traffic.  (*Id.* at

*2, 5.) In fact, the "mining company actually agreed with the evidence presented by the local residents that the trucks would impede traffic and cause severe damage to, and deterioration of, the roads in question." (*Id.* at *13.)

In this case, Rogers Group's property fronts on Highway 31, which is a four-lane, divided, U.S. Highway. Rogers Group has a permit from the State of Alabama to access Highway 31 directly from its property and as soon as that access is constructed it will not use any local Limestone County road. Even now, the trucks that have gone to and from the quarry have used only a very short section of Laughmiller Road, something on the order of ¼ mile or less to access the quarry site.

**The Expert For The Individual Plaintiffs Testified That Rock Quarries Do Not Impact Property Values**

Phil Fowler, the appraiser expert for the Individual Plaintiffs, agreed in his deposition with the conclusion by Rogers Group's expert, Steve Wright, that there is no evidence of quarries adversely impacting property values. (Fowler Dep., pp. 18-20, 55-56, 62-63, 174-77, Exhibit O hereto.) In his deposition, however, Mr. Fowler identified a theory, previously unarticulated by him, that in the first five to seven years of a quarry's operation it takes longer to sell property near it, even though it ultimately sells at the same price as property not near a quarry. (*Id.*) He then characterized that as an "opportunity cost" for individuals owning property,

calculated some "cost of capital" for them, and is now opining that the delay in plaintiffs being able to sell their property effectively reduces its value, even though their property is not now for sale.

The millions of dollars of damages Mr. Fowler concludes will be incurred by Judy Page and the Newby Family in the first five to seven years that this quarry is operating is both unfounded and irrelevant.  Mr. Fowler cited to no data of any kind showing that the sale of commercial or industrial property near a quarry is delayed by the presence of the quarry, much less that its value was lowered.

And in any event, neither Mrs. Page's property nor the Newby property is currently listed for sale.  Hence, there is no basis for them having suffered any damages to date, and it is entirely speculative whether, at some future point, the operation of this quarry would be a nuisance that would adversely impact the sale of either the Page or Newby property years from now.

And finally, as noted previously, it is not enough for the Individual Plaintiffs to prove that the quarry will devalue their property.  Instead, they must first prove that the quarry is a nuisance and then also prove that it has diminished their property values in the year it has been operating.

**The Page and Newby Properties Are Industrial or Commercial Sites**

Judy Page's property is proposed by her as the site for a large industrial operation, like an airplane or automobile manufacturing facility.  Most of her property is adjacent to Highway 65, and it is not clear it even has any frontage on Highway 31.  It is difficult to imagine the Rogers quarry could be a nuisance for this property fronting on a very busy interstate highway and proposed by Mrs. Page herself as the site for a very large factory, but that is Mrs. Page's claim.  Mrs. Page's property is not currently for sale and it is entirely speculative to assert that any operations by Rogers on its quarry site will ultimately interfere with the industrial use of her property years from now.

The Newby Family property fronts on Highway 31, and backs up to an active CSX rail line; it is not immediately adjacent to the Rogers Group property, and much, perhaps most of it, is close to a mile from blasting or processing activities on the Rogers site.

The Newby property is currently raw land being used for agricultural purposes; it is not for sale now and it is not known when, or if, it will be for sale. Mr. Newby believes that his property will someday be sold for a mixture of commercial and residential uses, but no plans have ever been developed for any such mixed use to date.  His claim that his sale price someday for some use,

commercial, industrial, or residential, will be lower because of the way Rogers is then operating this quarry is premature and speculative.

With respect to the individual homeowners, they are more than a mile away and will not be significantly impacted, if at all, by the quarry.

Respectfully submitted this 9th day of April, 2010.

/s/ H. Wayne Phears
H. Wayne Phears (Pro Hac Vice)
McGuireWoods LLP
Suite 2100, The Proscenium
1170 Peachtree Stree, NE
Atlanta, GA 30309
Telephone: 404-443-5500
Telecopier: 404-443-5599
wphears@mcguirewoods.com

/s/ Rebekah Keith McKinney
Rebekah Keith McKinney (ASB-3137-T64J)
Watson, McKinney & Artrip, LLP
203 Greene Street
P.O. Box 18368
Huntsville, AL  35801
Telephone: 256-536-7423
Telecopier: 256-536-2689
mckinney@watsonmckinney.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the 9th day of April, 2010, I have served a copy

of  the foregoing *TRIAL BRIEF ON BEHALF OF ROGERS GROUP, INC.* upon

the following by electronic service or by placing a copy of same in the United

States mail, postage prepaid and properly addressed.

P. Michael Cole
Richard J.R. Raleigh, Jr.
Marcus A. Huff
Wilmer & Lee P.A.
100 Washington Street
Suite 200
Huntsville, Alabama 35801

James M. Corder
Mitchell K. Shelly
Alexander, Corder, Plunk & Shelly, PC
P.O. Box 1129
Athens, Alabama 35612

The Honorable Troy King
Alabama Attorney General
500 Dexter Avenue
Montgomery, Alabama 36130

/s/ Rebekah Keith McKinney
Rebekah Keith McKinney